BILAL A. ESSAYLI
Acting United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
PETER DAHLQUIST
Assistant United States Attorney
Chief, Riverside Office
CORY L. BURLESON (Cal. Bar No. 322239)
Assistant United States Attorney
Deputy Chief, Riverside Office
     3403 Tenth Street, Suite 200
     Riverside, California 92501
     Telephone: (951) 276-6945
     Facsimile: (951) 276-6202
     Email:    Cory.Burleson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 5:25-mj-500-DUTY |
| Plaintiff, | PRELIMINARY HEARING BRIEF |
| v. | Date: August 15, 2025 |
| JOSE DE JESUS ORTEGA and DANIELLE NADINE DAVILA, | Time: 4:30 p.m. Court: Hon. Shashi H. Kewalramani |
| Defendants. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Cory L. Burleson, submits this brief to assist the Court in conducting the anticipated preliminary hearing in this matter.  The brief provides an overview

///

///

of the anticipated evidence at the preliminary hearing, case law governing preliminary hearings, the probable cause standard, evidentiary matters, and disclosures.

Dated: August 14, 2025           Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division

PETER DAHLQUIST
Assistant United States Attorney
Chief, Riverside Office

_____

CORY L. BURLESON
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ii

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.   INTRODUCTION**

On July 24, 2025, defendant Jose de Jesus Ortega ("Ortega") and Danielle Nadine Davila ("Davila") (collectively, "defendants") were charged by criminal complaint with forcibly assaulting, impeding, and interfering with a federal officer involving physical contact, in violation of 18 U.S.C. § 111(a)(1), and conspiring to prevent, by force and intimidation, a federal officer from discharging his duties, in violation of 18 U.S.C. § 372.  The offenses arise from an incident in which an Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") followed a fleeing suspect into the Ontario Advanced Surgery Center (the "Surgery Center"). While the ERO officer was attempting to detain the fleeing suspect, defendants assaulted, impeded, and interfered with the officer. Defendants were arrested and made their initial appearances on July 25, 2025.  On August 14, 2025, the Court dismissed the § 372 count on motion by the government.  (ECF 27.)  On August 15, 2025, the Court is scheduled to hold a preliminary hearing to determine if the § 111(a)(1) charge is supported by probable cause.

**II.   THE PURPOSE OF A PRELIMINARY HEARING IS TO DETERMINE WHETHER THERE IS PROBABLE CAUSE**

At a preliminary hearing, the court's sole task is to determine whether there is "probable cause to believe an offense has been committed and the defendant committed it."  Fed. R. Crim. P. 5.1(e). In other words, "the purpose of a preliminary hearing . . . is to require the government to show probable cause to hold a suspect pending trial."  <u>Hooker v. Klein</u>, 573 F.2d 1360, 1367 n.7 (9th Cir. 1978).  Courts routinely apply this same probable cause standard when

reviewing complaints and search warrants.  Probable cause requires "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007); see also Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C. Cir. 1973) ("Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt."); United States v. Bishop, 264 F.3d 919, 924 (9th Cir. 2001) ("Probable cause exists when there is a fair probability or substantial chance of criminal activity.").  "[C]onclusive evidence of guilt is of course not necessary . . . to establish probable cause," Lopez, 482 F.3d at 1072, which means "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the probable-cause decision. . . .  All we have required is the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) (citations omitted).

In evaluating probable cause, courts consider the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 238 (1983). Under this standard, courts must consider "the whole picture" rather than viewing individual facts "in isolation." District of Columbia v. Wesby, 138 S. Ct. 577, 588 (2018).  Accordingly, "[i]t is not uncommon for seemingly innocent conduct to provide the basis for probable cause." United States v. Rodriguez, 869 F.2d 479, 483 (9th Cir. 1989); see also United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995) ("[O]bservations of conduct consistent with drug

trafficking, even though apparently innocuous, can give rise to probable cause.").  A magistrate judge presiding over a preliminary hearing can "legitimately find probable cause while personally entertaining some reservations."  Coleman, 477 F.2d at 1202.

Inquiries about potential affirmative defenses are not relevant to the probable cause determination.  Broam v. Bogan, 320 F.3d 1023, 1023 (9th Cir. 2003) (once probable cause established, an officer need not investigate further to look for evidence that may exculpate accused "whether the claim is based on mistaken identity or a defense such as lack of requisite intent" (quoting Baker v. McCollan, 443 U.S. 137, 145-56 (1979))).  An affirmative defense to a crime "does not negate the commission of the crime charged or the existence of any element thereof.  It is an excuse [or justification] for a crime, not a denial of one."  Labensky v. County of Nassau, 6 F. Supp. 2d 161, 177 (E.D.N.Y. 1998), aff'd sub nom Labensky v. Rozzi, 173 F.3d 845 (2d Cir. 1999).  Thus, evidence relating to an affirmative defense is irrelevant at a preliminary hearing, the sole purpose of which is to determine whether there is probable cause to believe that defendant committed a crime.  See United States v. Pack, 255 F. Supp. 3d 695, 699-700 (S.D. Tex. 2017) (quoting Labensky in finding probable cause following a preliminary hearing, stating that the defendant was "mistaken as to the relationship between [an affirmative defense] and probable cause" and that "the probable cause arising from [defendant's] actions remains unaffected by the subsequent [assertion] of" an affirmative defense).

Nor does the probable cause inquiry permit courts to question the thoroughness of an investigation that might have provided more than the minimal "fair probability" threshold -- even where further

3

investigation may uncover "potentially dispositive" evidence.  United States v. Goude, 440 F.3d 1065, 1073 & n.5 (9th Cir. 2005) (en banc) ("the benchmark is not what the FBI 'could have' done" (citing United States v. Miller, 753 F.2d 1475, 1481 (9th Cir. 1985) (probable cause exists even though officers failed to take "simple steps" which could have independently verified facts))).  Once probable cause is established, there is simply no requirement that officers "continue to investigate or seek further corroboration."  Ewing v. City of Stockton, 588 F.3d 1218, 1227 (9th Cir. 2009).

**III. EVIDENTIARY MATTERS**

A.   The Federal Rules of Evidence do not apply.

The Federal Rules of Evidence "do not apply to . . . a preliminary examination in a criminal case."  Fed. R. Evid. 1101(d)(3).  The only exception is that the rules on privilege still apply.  Fed. R. Evid. 1101(c).  As described below, the evidence that may be presented at preliminary hearings differs in important respects from the typical rules of evidence.

B.   Hearsay is admissible.

Because the normal rules of evidence do not apply, hearsay is admissible at preliminary hearings.  See, e.g., Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) ("In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial.  Indeed, at a preliminary hearing in federal court a finding of probable cause may be based upon hearsay in whole or in part.") (internal quotation marks omitted); Peterson v. California, 604 F.3d 1166, 1171 n.4 (9th Cir. 2010) (the Fourth Amendment permits a determination of probable cause at a preliminary hearing based on hearsay testimony).  This concept has deep roots.

4

Rule 5.1, the rule governing preliminary hearings, previously contained an explicit statement that "[t]he finding of probable cause may be based upon hearsay evidence in whole or in part."  The Advisory Committee omitted that language in the 2002 amendments, deeming it unnecessary because federal law had become clear that it is appropriate to rely on hearsay at the preliminary hearing and the Federal Rules of Evidence explicitly state that they do not apply at this stage.  Fed. R. Crim. P. 5.1 Advisory Committee Notes on 2002 Amendments; Fed. R. Evid. 1101.  Presentation of hearsay at a preliminary hearing also poses no Confrontation Clause problem because the Confrontation Clause is a trial right.  Peterson, 604 F.3d at 1169-70.

     C.    Suppression arguments are premature.

     At a preliminary hearing, the defendant "may not object to evidence on the ground that it was unlawfully acquired."  Fed. R. Crim. P. 5.1(e).  Thus, a defendant may not raise arguments that evidence should be suppressed.  See, e.g., Giordenello v. United States, 357 U.S. 480, 484 (1958); United States v. Olender, No. 00-CR-80141-DT, 2000 WL 977295, at *3 (E.D. Mich. May 26, 2000).

     D.    Cross-examination is limited.

     Because the only purpose of the preliminary hearing is to determine probable cause, the scope of cross-examination of government witnesses is limited.  "Cross-examination at a preliminary hearing, like the hearing itself, is confined by the principle that a probe into probable cause is the end and aim of the proceeding[.]" Coleman, 477 F.2d at 1201.  Defense counsel may not use cross-examination to go "on an impermissible quest for discovery."  Id. For example, the Fifth Circuit upheld a magistrate judge's decision

to prevent cross-examination about the identity of an informant. United States v. Hart, 526 F.2d 344, 344 (5th Cir. 1976).

Likewise, cross-examination questions directed to potential suppression arguments would be outside the scope of the preliminary hearing.  In addition to the special limitations for preliminary hearings, "cross-examination is properly to be limited at preliminary hearing, as at trial, to the scope of the witness'[s] direct examination."  Coleman, 477 F.2d at 1201.

E.   Defense subpoenas are limited.

The defendant is entitled to subpoena witnesses "whose testimony promises appreciable assistance on the issue of probable cause," unless there is "good cause for not requiring [the witness's] presence."  Id. at 1205.  Good cause for not requiring a witness's presence may include "physiological or psychological reasons" that make appearance unreasonable.  United States v. King, 482 F.2d 768, 773 (D.C. Cir. 1973).  Subpoenas must comply with Rule 17, including the requirement that the defense obtain a court order for any subpoena requiring production of personal or confidential information about a victim and that the court give the victim an opportunity to move to quash the subpoena.  Fed. R. Crim. P. 17.  Subpoenas may not seek privileged information.  See Fed. R. Evid. 1101(c), (d) (stating that rules on privilege apply to preliminary examinations in criminal cases).  Subpoenas are not "a means of discovery for criminal cases," and, as always, they must be limited to relevant, admissible, and specific information.  United States v. Nixon, 418 U.S. 683, 698-99 (1974); see also United States v. Komisaruk, 885 F.2d 490, 494-95 (9th Cir. 1989) (courts may quash subpoenas if the information sought would be immaterial, unreasonable, oppressive, or irrelevant).

**IV.    WITNESS AND EXHIBITS**

The United States plans to call one witness at the preliminary hearing, the case agent, Special Agent Fahd Farouh with Homeland Security Investigations ("HSI").  For the hearing, the United States hereby submits SA Farouh's affidavit in support of the criminal complaint in this case, attached as Exhibit 1.  The United States anticipates that SA Farouh will affirm that the facts in his affidavit are correct, and the United States plans to supplement those facts with video evidence and additional testimony from SA Farouh regarding the incident discussed in Exhibit 1.

**V.    DISCLOSURES REQUIRED INCIDENT TO PRELIMINARY HEARINGS**

Disclosure is a natural, but collateral, effect of any preliminary hearing.  A preliminary hearing "does not include discovery for the sake of discovery." Coleman, 477 F.2d at 1199-200; see also Robbins v. United States, 476 F.2d 26, 32 (10th Cir. 1973) ("[A] preliminary hearing is not designed for the purpose of affording discovery for an accused."); United States v. Begaye, 236 F.R.D. 448, 454 (D. Ariz. 2006) ("[T]he rules of discovery found in Rule 16, Federal Rules of Criminal Procedure, are not applicable to preliminary hearings.").  Rather, Rule 5.1 directs the parties to make certain limited disclosures.  Specifically, the parties are required to produce the statements of the witnesses whom they call to testify at the preliminary hearing.  Fed. R. Crim. P. 5.1(h), 26.2.

Statements must be produced only if they "relate[] to the subject matter of the witness's testimony" and also fall into one of the following categories:

> (1) a written statement that the witness makes and signs, or otherwise adopts or approves;

7

> (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or
>
> (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

Fed. R. Crim. P. 26.2(f).  As to the first category, a report or notes on a witness interview cannot be adopted by the witness unless the witness read them or heard them read back.  Goldberg v. United States, 425 U.S. 94, 110 n.19 (1976); United States v. Traylor, 656 F.2d 1326, 1336 (9th Cir. 1981).  As to the second category, records only qualify if they "reflect the witness'[s] own words" and constitute a "complete recital."  United States v. Bobadilla-Lopez, 954 F.2d 519, 522 (9th Cir. 1992).  Thus, Rule 26.2 generally does not require disclosure of interview reports unless the report author is a testifying witness and testifies about the interview.  See United States v. Moore, 651 F.3d 30, 75 (D.C. Cir. 2011).  If material does qualify as witness statements, it must be turned over "[a]fter a witness . . . has testified on direct examination."  Fed. R. Crim. P. 26.2(a); see United States v. Mills, 641 F.2d 785, 789-90 (9th Cir. 1981) (holding that "no statement of a government witness is discoverable until the witness has testified on direct examination").

## VI.    CONCLUSION

The foregoing provides an overview of legal issues relating to preliminary hearings and the anticipated evidence at the preliminary hearing in this case.  Should any issue arise that has not been covered in this brief, the government respectfully requests leave to submit such further memoranda as may be necessary.

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

<div style="border:1px solid">

**LODGED**
CLERK, U.S. DISTRICT COURT

**07/24/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____AP_____ DEPUTY

</div>

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

**07/24/25**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____KC_____ DEPUTY

UNITED STATES OF AMERICA,

v.

JOSE DE JESUS ORTEGA, and
DANIELLE NADINE DAVILA,

Defendants.

Case No.    5:25-mj-00500

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On July 8, 2025, in the County of San Bernardino, within the Central District of California, defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 111(a)(1) & 372 | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

HSI Special Agent, Fahd Farouh
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    July 24, 2025

*Judge's signature*

City and state:   Riverside, California

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Cory L. Burleson

## **AFFIDAVIT**

I, Fahd Farouh, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.  This affidavit is made in support of a criminal complaint against, and arrest warrants for, Jose De Jesus Ortega ("ORTEGA") and Danielle Nadine Davila ("DAVILA") for a violation of 18 U.S.C. § 111(a)(1), forcibly assaulting, impeding, and interfering with a federal officer involving physical contact; and a violation of 18 U.S.C. § 372, conspiring to prevent, by force and intimidation, a federal officer from discharging his duties.

2.  The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. **AFFIANT BACKGROUND**

3.  I am a Special Agent with Homeland Security Investigations ("HSI") and have been employed as a Special Agent since March 2023.  I am currently assigned to the HSI Assistant Special Agent in Charge Office in Riverside, California.

4. I am a graduate of the Federal Law Enforcement Training Center and have received extensive training in the investigation of narcotics trafficking, financial crimes, violent offenses, and other violations of federal law. I have participated in hundreds of investigations involving Title 18 and Title 21 offenses. I am also cross designated to enforce federal narcotics laws and have collaborated with several federal law enforcement agencies, various state and local agencies.

5. Throughout my career, I have arrested numerous individuals for criminal offenses, conducted numerous interviews with witnesses, defendants, prosecutors, and participated in both covert and overt surveillance. I am familiar with the tactics used by defendants and criminal organizations to smuggle narcotics, evade detection, assault law enforcement officers, and obstruct investigations.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

6. Unless otherwise indicated, I know the following based on my review of law enforcement reports, conversations with other law enforcement agents, my review of publicly available video recordings, and my own knowledge of the investigation:

### A. **Illegal Alien Flees from ERO Officers and Runs into Surgery Center**

7. On July 8, 2025, two Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") officers (hereinafter, "Officer One" and "Officer Two") were conducting roving immigration-related operations as part of

2

their official duties in Ontario, California.  Officer One and Officer Two were wearing government-issued equipment, including marked law enforcement vests.  Officer One and Officer Two were in an unmarked government-operated vehicle.

8.   A little before 10:00 a.m., Officer One and Officer Two were following a truck with three adult males when they saw the truck make a quick turn into the parking lot of the SCA Health Ontario Advanced Surgery Center (the "Surgery Center"), located at 1211 West 6th Street, Ontario, California 91762.

9.   The three adult males exited the truck, and one of them began urinating on the exterior wall of the Surgery Center. At that time, Officer One and Officer Two decided to conduct a consensual encounter with the three adult males.

10.  As soon as Officer One and Officer Two exited their vehicle, the two non-urinating males fled the area on foot in opposite directions.  According to Officer One, one of the fleeing males, later identified as an illegal alien (the "Target Alien"),[1] ran towards the entrance of the Surgery Center. Officer One followed the Target Alien, while Officer Two stayed with the adult male who did not flee.

11.  According to Officer One, following a foot pursuit, Officer One partially detained the Target Alien near the front entrance of the Surgery Center.  The Target Alien resisted and pulled away from Officer One, and both Officer One and the Target Alien fell on the ground near the Surgery Center's

---

[1] The Target Alien's identity is known to law enforcement. According to the Target Alien's A-File, the Target Alien is a Honduran national without permission to be in the United States.

3

entrance.  Shortly thereafter, an individual dressed in medical staff attire helped the Target Alien off the ground and assisted in pulling the Target Alien away from Officer One.

12.  According to Officer One, the Target Alien proceeded inside the Surgery Center towards a door that Officer One believed led into a private area of the Surgery Center.  Officer One followed and stopped the Target Alien near that door.

**B.    ORTEGA and DAVILA Assault, Impede, and Interfere with Officer One**

13.  On July 11, 2025, and the days that followed, I reviewed publicly available video recordings of Officer One's encounter with the Target Alien and various staff members inside the Surgery Center.  One of the video clips I reviewed was posted on YouTube by the New York Post, and it appears that the footage was captured by one or more individuals inside the Surgery Center using one or more cell phones.[2]  Based on my review of this video footage, I know the following:

a.    Officer One was wearing a vest with "ICE" and "POLICE" markings that were clearly visible.

b.    Officer One was near a doorway inside the Surgery Center attempting to detain the Target Alien.  Throughout the clip, multiple individuals--who appeared to work at the clinic based on their attire and/or the statements they made in the video--surrounded Officer One.

---

[2] The video footage is available at https://www.youtube.com/watch?v=9PW6Bysinn0 (last accessed on July 23, 2025).

4

c.    One of those individuals was a male, who was later identified (as described below) as ORTEGA.  In the video, it appears that ORTEGA was wearing navy blue medical scrubs, white Croc-style sandals, a light blue surgical cap with the letters "LA" on the front of it,[3] and a black watch on his left wrist.

d.    Another individual in the video was a female, who was later identified (as described below) as DAVILA.  In the video, it appears that DAVILA was wearing navy blue medical scrubs with light blue Croc-style sandals.  DAVILA was also wearing glasses and appears to have reddish-brown hair.

e.    At one point in the video, Officer One was facing the Target Alien with ORTEGA and DAVILA to Officer One's left. DAVILA, along with other staff members, told Officer One to leave.  A few moments later, while Officer One had a grasp on the Target Alien, DAVILA told Officer One, "Get your hands off of him."  DAVILA then lowered herself under Officer One's outstretched arm and wedged herself between Officer One and the Target Alien.  Officer One then attempted to pull the Target Alien towards him, but Officer One was unable to do so because DAVILA had positioned herself between Officer One and the Target Alien.

---

[3] The "LA" letters are not clearly visible in the video clip posted by the New York Post, but the letters are more visible in another video clip of the incident posted on YouTube by KTLA. That video footage is available at https://www.youtube.com/watch?v=7Yhox15fvDw (last accessed on July 23, 2025).

f.   Immediately thereafter, ORTEGA, who was still standing to Officer One's left, appeared to grab Officer One's arm and then his vest, causing Officer One to turn toward ORTEGA.  Officer One responded, telling ORTEGA not to touch him.

g.   Seconds later, it appears that Officer One was trying to regain his grasp on the Target Alien.  However, DAVILA was still standing between Officer One and the Target Alien, preventing Officer One from maintaining his grasp of the Target Alien and preventing Officer One from detaining the Target Alien.  DAVILA started shouting in Officer One's face, "let him go" and "get out."  Officer One responded by telling DAVILA that she "touched a federal agent."  Meanwhile, ORTEGA appears to maintain one hand on Officer One, with the other hand pointing in the opposite direction while directing Officer One to leave.

h.   Officer One attempted to reach around DAVILA, who was still wedged between Officer One and the Target Alien. DAVILA then appears to push Officer One with her body while holding onto the door handle with her left hand and using her right hand to brace herself against the doorway for leverage. In doing so, DAVILA further prevented Officer One from detaining the Target Alien.  ORTEGA then grabbed Officer One's left arm in an apparent attempt to move Officer One away from the Target Alien and DAVILA.

## C.   Officer One and Officer Two Eventually Detain the Target Alien

14.  According to Officer One, at one point, Officer One called Officer Two and requested assistance in detaining the

6

Target Alien.  According to Officer Two, during that phone call, Officer One told Officer Two that he was inside the Surgery Center with the Target Alien, and Officer One said, "they're grabbing me."

15.  Officer Two eventually entered the Surgery Center after Surgery Center staff members initially locked him out. According to Officer Two, when he entered the Surgery Center, he saw multiple staff members grabbing Officer One while Officer One was attempting to detain the Target Alien.  Officer Two also reported that he saw a female staff member had wedged herself between Officer One and the Target Alien, which impeded Officer One's ability to detain the Target Alien.

16.  According to the officers, Officer One and Officer Two eventually detained the Target Alien in handcuffs and exited the Surgery Center.

**D.    ORTEGA Identified**

17.  On July 16, 17, and 18, 2025, HSI Special Agents conducted surveillance outside the Surgery Center to identify ORTEGA and DAVILA.

18.  On July 16, 2025, HSI Special Agents saw a black Volkswagen hatchback parked amongst other vehicles on the west side of the Surgery Center, which agents believe is the employee parking area because it is surrounded by a fence.  The hatchback had a California license plate number ending in xxxx743.

19.  According to California Department of Motor Vehicle ("DMV") records, the hatchback is registered to ORTEGA at an address in Highland, California.  The DMV photo for ORTEGA is

7

shown below on the left, and the male in the photo closely resembles the male that assaulted Officer One on July 8, 2025, as shown in the New York Post video discussed above.

 

20.  On July 17, 2025, at approximately 5:48 a.m., HSI Special Agents saw the black hatchback enter the Surgery Center parking lot and drive to the employee parking area.  Agents saw a tall, Hispanic male--who resembled ORTEGA's DMV photo wearing a blue baseball hat with the Los Angeles Dodgers "LA" logo--exit the hatchback and enter the Surgery Center's rear entrance. About thirty minutes later, agents saw the same male outside the facility in the employee parking area talking to another individual.  This time, the male that resembled ORTEGA was wearing navy blue scrubs and a light blue surgical cap that had "LA" in white letters on the front of it.  The light blue surgical cap appears to be the same surgical cap worn by the male who assaulted Officer One on July 8, 2025 (as shown in the screenshot below).

8



21.  On July 18, 2025, HSI Special Agents again saw the hatchback park in the Surgery Center's employee parking area.  A male who resembled ORTEGA--wearing dark blue scrubs, a black watch on his left wrist, and a light blue surgical cap with "LA" letters on the front--exited the hatchback and walked towards the Surgery Center's rear entrance.  A Special Agent also saw what appeared to be a tattoo or physical marking on ORTEGA's right forearm.  Photos of ORTEGA in the employee parking area are included below:

  

22.   HSI searched for ORTEGA in law enforcement databases. One of the databases included photos of tattoos that ORTEGA has on his right forearm (shown below on the left).  The tattoos are consistent with the male resembling ORTEGA in the New York Post video discussed above (screenshots from which are the two photos on the right below).

  

23.   For these reasons, I believe that the male who assaulted Officer One on July 8, 2025, is ORTEGA.

**E.    DAVILA Identified**

24.   On July 20, 2025, HSI Special Agents conducted open-source and law enforcement queries.  In doing so, Special Agents found a publicly available list of employees for the Surgery Center.  The list of employees included DAVILA, who is listed as a Certified Surgical Technologist.

25.   Using California DMV records, agents identified DAVILA's registered address in Corona, California, and a copy of DAVILA's DMV photo.  The female in the DMV photo closely resembles the female that assaulted Officer One on July 8, 2025, as shown in the New York Post video discussed above.

10

 

26.   On July 22, 2025, HSI Special Agents conducted surveillance at the address on DAVILA's driver's license. Parked outside the address, agents saw a white Hyundai Sonata bearing a California license plate number ending in xxxx244, registered to DAVILA at the address.

27.   According to Special Agents on surveillance, at approximately 7:52 a.m., a female adult closely resembling DAVILA and a juvenile male exited the residence at the address and entered the Sonata.  The female was dressed in navy blue scrubs and light blue Croc-style sandals.  Photos of the female outside the residence are included below:

11




28.   Special Agents followed the Sonata from the residence to the Surgery Center, where other agents and law enforcement officers were staged.  Law enforcement saw the Sonata park in the Surgery Center's employee parking area, and then they saw DAVILA and the juvenile walk towards the Surgery Center's rear entrance.

29.   Based on their surveillance, agents believe DAVILA closely resembled the female in the New York Post and KTLA videos discussed above because DAVILA has faded, red dye in her hair, DAVILA's hair was tied up in a loose bun, and she was wearing glasses, navy blue scrubs, and light blue Croc-style sandals.  As shown in the screenshots below from the New York Post video, these features and descriptions are consistent with the female who assaulted Officer One on July 8, 2025:

12

 

30.  For these reasons, I believe that the female who assaulted Officer One on July 8, 2025, is DAVILA.

### IV. CONCLUSION

31.  For all the reasons described above, there is probable cause to believe that ORTEGA and DAVILA each committed a violation of 18 U.S.C. § 111(a)(1), forcibly assaulting, impeding, and interfering with a federal officer involving physical contact; and a violation of 18 U.S.C. § 372, conspiring to prevent, by force and intimidation, a federal officer from discharging his duties.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 24th day of July, 2025.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

13